# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

AISHA HASSAN, and
LAVERNE MCGEE,

      Plaintiffs,

v.

RICK SINGH, in his capacity as
ORANGE COUNTY PROPERTY
APPRAISER,

      Defendant.

_____/

CASE NO.:

JURY TRIAL DEMANDED

## VERIFIED COMPLAINT

Aisha Hassan ("Hassan") and Laverne McGee ("McGee") (collectively, the "Plaintiffs"), by and through their undersigned counsel, hereby file this verified complaint against Rick Singh ("Singh") in his capacity as the Orange County Property Appraiser (the "OCPA") for violation of their rights under Florida's Public Sector Whistleblower's Act, §§ 112.3187-112.31895, Fla. Stat. (2018) (the "FWA"), for violations of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000(e) (hereafter "Title VII"), for violations of the Florida Civil Rights Act, Chapter 760, Florida Statutes (hereinafter "FCRA"), and under the First Amendment to the United States Constitution (the "First Amendment"), and in support state as follows:

## NATURE OF ACTION

1.     This is an action arising from and seeking redress for the OCPA's violations of the FWA, Title VII, FCRA, and the First Amendment.

**JURISDICTION AND VENUE**

2.      This Court possesses federal question jurisdiction over the claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1331 because they arise under the First Amendment, enforced through 42 U.S.C. § 1983, and Title VII.

3.      This court has supplemental jurisdiction over Plaintiffs' FWA and FCRA claims under 28 U.S.C. § 1367(a) as these claims are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred in the Middle District of Florida; and under 28 U.S.C. § 1391(b)(1) because the OCPA resides within the Middle District of Florida.

**PARTIES**

5.      Plaintiffs are residents of Orlando, Orange County, Florida.

6.      Plaintiffs were each an "employee" of Defendant as defined by Section 112.3187(3)(b) of the FWA and 42 U.S.C. § 2000e(f).

7.      The OCPA is an "official" of a local governmental agency and, thus, is an "agency" as defined by Section 112.3187(3)(a) of the FWA.

8.      The OCPA is primarily responsible for identifying, locating, and valuing real and personal property located in Orange County, Florida, for tax purposes.

9.      At all times material hereto, the OCPA was an "employer" as defined by section 760.02(7), Florida Statutes, and 42 U.S.C. § 2000e(b) because it engaged in an industry affecting commerce and had fifteen (15) or more employees for each working day in each of twenty (20)

or more calendar weeks in the year the unlawful employment practices took place and the preceding calendar year.

## PROCEDURAL REQUIREMENTS

10.     Plaintiffs timely dual filed charges of discrimination and amended charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

11.     More than 180 days have passed since the filing of Plaintiffs' charges and this action is being brought within 90 days of the EEOC's Notices of Dismissal and Rights to Sue.

12.     Additionally, information disclosed pursuant to the FWA concerning local governmental agencies must be made to a chief executive officer of such agency or other appropriate local official, which includes the OCPA.

13.     As defined in Section 447.203(9), the "chief executive officer" is the elected person who is responsible to the legislative body of the public employer for the administration of the governmental affairs of the public employer.

14.     On June 22, 2017, Plaintiffs submitted their written and signed complaint to the OCPA.

15.     Plaintiffs have satisfied all of the administrative procedures that were conditions precedent to filing their claims pursuant to federal and state law.

## GENERAL FACTUAL ALLEGATIONS

16.     Hassan was the director of finance for the OCPA.

17.     Hassan's duties included ministerial tasks related to the OCPA budget process and financial activities, at the direction of Singh.

18.     McGee was the OCPA's director of communications.

19.     McGee handled media inquiries directed to the OCPA's office, as well as information and press releases disseminated from the OCPA's office, at the direction of Singh.

## PLAINTIFFS' DISCOVERY OF AND OPPOSITION TO UNLAWFUL ACTIVITY BY SINGH/OCPA

20.     During the course of their employment with OCPA, Plaintiffs witnessed or otherwise became aware of activities by Singh, acting as the OCPA, that violated multiple laws, rules and regulations relating to Florida governmental agencies.  These unlawful activities fell into several categories, as set forth below.

## FALSIFYING, ALTERING AND SHREDDING AUDIT DOCUMENTS

21.     In June 2015, the then current Orange County Comptroller, Martha Haynie, initiated an audit into the OCPA as a result of allegations of misspending county funds on personal travel expenses.

22.     In particular, the audit focused on the use of a procurement card (OCPA credit card) for travel from the period of January 2013 through June 2015.

23.     The audit was intentionally delayed by Singh to give him time to review, edit, and remove relevant documentation.

24.     Once reviewed, Singh instructed staff members to remove or alter documents before presentation to the audit team.  (**Exhibit 1, Original and Altered Documents**).

25.     Once documents were altered, Singh instructed Hassan to shred the originals. However, she placed them in a box within her office so as to not violate Florida's sunshine laws.

26.     Additionally, documents were created by the OCPA at Singh's direction to justify certain improper expenditures that were reviewed by the audit team.

27.     Additionally, Singh, who is from Guyana, attempted to deter the auditors from reaching critical findings by falsely claiming that there was a racial or discriminatory motive behind the audit.

28.     To support this false accusation, Singh directed staff who were African-American (former human resources manager, Willis Perry), Indian (the COO, Manish Bhatt) and Muslim (Hassan) to prepare written statements specifically accusing the Comptroller's office of acting with improper racial animus.

29.     Plaintiffs felt they would be terminated if they did not submit the statements.

30.     This use of the "race card" apparently was successful, as the audit was significantly narrowed and was ultimately limited in scope.

## PERSONAL TRAVEL USING TAXPAYER FUNDS

31.     Both before and after the audit, Singh took several personal trips that were paid for, in whole or in part, through the use taxpayer funds.

32.     Singh's violation of the law in this regard was particularly brazen.   On one occasion, he told McGee that he created a document describing all places that he wanted to go for the rest of the year and provided it to McGee.

33.     When McGee questioned Singh about the list, he stated "these are places I want to go, this is what I want to do for the rest of the year" and added that she was going to have to "come up with justifications for these things to show why I'm going."

34.     When McGee resisted this plan, Singh directed her to "write up something and make it sound like it's legitimate" and to "make up something that we can justify why the office is involved."

35.     Consistent with these statements, Singh took several personal trips that were paid for through OCPA funds.

**Dallas, Texas**

36.     On a trip to Texas, Singh had his physician friend, Varesh Patel, draft a letter about a purported back condition to support his layover in Dallas, Texas so that he could attend a wedding.  **(Exhibit 2)**.  This letter was provided to the Comptroller auditors.

37.     The Dallas, Texas trip occurred while Singh was traveling to a conference in Sacramento.

38.     Another OCPA staff member flew directly to the conference, which caused the inquiry by the Comptroller's office.  There was an additional expense – flight and lodging – (paid by taxpayers) associated with the layover.

39.     Singh accidently revealed to staff, including Hassan, during a meeting that he had, in fact, attended a wedding in Dallas.

**Grand Rapids, Michigan**

40.     In August 2013, Singh attended an International Association of Assessing Officers (hereafter "IAAO") conference in Grand Rapids, Michigan along with staff members Roger Ross, Robert Brown and Robert McCulloch.

41.     Singh upgraded his room to receive "concierge access" at an increased cost per day.  The other staff members did not receive an upgrade.  The auditors questioned this upgrade.

42.     As a result, Singh instructed Hassan to call the hotel's assistant general manager in 2015 to say that the room had not been upgraded.

43.     Initially, the assistant general manager of the hotel correctly confirmed to Hassan that Singh's room was upgraded.  **(Exhibit 3)**.

44.     Not pleased, Singh directed Hassan to contact the hotel's assistant general manager to send another email falsely representing that the room was booked at the hotel's "regular rate."  The assistant general manager ultimately complied with the request.  **(Exhibit 4)**.

### Chicago, Illinois

45.     Although the IAAO conference in Grand Rapids started on Sunday, August 25, 2013, Singh went on Thursday, August 22, 2013. He rented a vehicle that he used for a personal trip to Chicago that lasted several days. **(Exhibit 5, Affidavit of Robert Brown; Exhibit 6, Enterprise Invoice)**.

46.     Singh charged the car rental for his personal trip on the OCPA credit card and falsely reported that he attended the IAAO conference "on August 22-29, 2013."  **(Exhibit 7, August 29, 2013, memo)**.

47.     Singh falsely reported that he shared the vehicle with staff members Roger Ross, Robert Brown and Robert McCulloch.  In reality, these staff members took taxies and were later reimbursed for those expenses.  **(Ex.5)**.

### Ft. Lauderdale, Florida

48.     In November 2013, Singh attended an IAAO conference in Hollywood Beach, Florida.  After the conference concluded, he stayed an extra night and checked into the Hilton on Ft. Lauderdale beach at taxpayer expense.

49.     The original internal memorandum listed the justification for staying an extra night as "inclement weather" **(Exhibit 8).** However, other members of the OCPA staff who also attended the meeting traveled back to Orlando after the conference without incident.

50.     Later, in 2015, when the Comptroller's auditors questioned the hotel expense for the extra day, Singh had the original memorandum removed and a new one created that listed the

justification for an extra night's stay as the "conference events and meetings lasted well into the evening and necessitated an unforeseen additional night stay," which was false **(Exhibit 9).**

51.     The IAAO conference "events and meetings" concluded well before evening time at which time Singh traveled to Ft. Lauderdale to check into the Hilton.  In fact, the Hilton invoice lists Singh's arrival time as 5:23 p.m. **(Exhibit 10).**

## Tampa, Florida (Curry Festival)

52.     In April 2013, Singh attended a Curry Festival in Tampa and charged gas and lodging for his personal trip to the OCPA's office.

53.     The curry festival occurred over a two-day period, April 19, 2013 (gala), to April 20, 2013 (festival).

54.     The Comptroller's audit questioned these expenses in 2015.

55.     Singh told the auditors that the OCPA office was a sponsor at the curry festival with a booth, which was false.

56.     The OCPA was not a sponsor and was not listed as a sponsor on the 2013 curry festival poster.

57.     As a result of the auditors' inquiries, two years later in 2015, Singh had his friend, Dr. Ram P. Ramcharran, who was involved in the curry festival, draft a letter to attempt to justify the expenses. **(Exhibit 11).** Dr. Ramcharran works at Body Temple MediSpa & Sex Clinic in Palm Harbor, Florida.

58.     Moreover, Singh directed a staff member, Vikaash Maharaj, to photoshop a banner with a picture of Singh showing his alleged participation in OCPA business at the festival **(Exhibit 12).**

59.     The photo was actually taken at park near Singh's residence.

60.    Singh arranged for the OCPA banner and tent to be brought out to the photograph location.

61.    Maharaj then superimposed the photo onto an actual photo of the curry festival, emailed the photo to Singh's personal gmail address, and asked him if he "want[ed] anything changed."  **(Exhibit 13.)**

62.    The logo on the photoshopped banner was not in use by the OCPA in 2013.  The "CFA" on the top of the logo was added well after the festival occurred.

### New York City, New York

63.    Singh took a trip to New York City using taxpayer funds to attend a FIABCI (International Real Estate Federation) conference hosted by the United Nations in New York on April 4-5, 2017, under the false premise he was invited in his official capacity.

64.    Singh flew to New York on March 30, which was several days before the conference occurred.

65.    Singh, as an added layer of protection against questioning relating to the New York trip, had McGee set up a meeting with a local New York property appraiser's office.  The meeting never occurred.

66.    Singh arranged for correspondence from the FIABCI to be fabricated and given to Hassan to justify the taxpayer money spent on his attendance at the New York conference and a later Spain conference.  **(Exhibit 14)**.  Singh's handwriting on a draft of a document explains how to further falsify the correspondence ("Our meeting on Friday was insightful and Orange County residents should be proud of your reputation") **(Ex. 14)**.

67.    For the New York FIABCI conference, Singh purchased his airline ticket using his personal credit card and then, the day before the flight, then instructed Hassan to reimburse

him the average cost of three different flights from Orlando to Newark offered by three different airlines the next day because he was not going to submit documentation for the actual cost of his ticket.

68.     Singh gained the benefit of an excessive reimbursement due to the fact that the ticket amount for a next day flight was very high.

69.     Singh never submitted documentation for the actual cost of his ticket.

**Andorra, Spain**

70.     The Spain conference was another FIABCI event held on May 23-28, 2017.  It was conducted in Andorra, Spain.  Singh attended again under the false premise that he was invited and attending in his official capacity (**Ex. 14**).

71.     In planning for the Spain trip, Hassan sent an email to Robert Reed at Travelmax of Central Florida requesting airfare prices for economy class, to which Mr. Reed provided quotes.

72.     The next day, Singh reprimanded Hassan for sending the email to Mr. Reed stating, "[N]ow there is an official document with a quoted price of economy class."  Singh instructed Hassan to call Mr. Reed and request business class pricing.

73.     Ultimately, Singh flew business class to Spain at a cost of $4,548.83.

74.     In total, Singh used $8,342.83 of taxpayer funds to attend the FIABCI event in Spain (**Exhibit 15**).

**Boston, Massachusetts**

75.     In June 2017, Singh was in Boston, Massachusetts.  He was scheduled to attend a course at the Harvard Kennedy School Executive Education on June 5.

76.     As part of the application for the course, Singh listed a "Bachelor of Arts in Management and Counseling" and "Master of Arts in Management and Counseling" both from "Georgetown Wesleyan University" ("GWU") **(Exhibit 16).** Singh did not actually earn these degrees, which are signed by his friend, Dr. Ramcharran, who is listed as a member of GWU executive committee.

77.     Although the course was not set to begin until June 5, Singh and his wife flew to Boston on June 2 and stayed at the Intercontinental Hotel until June 5 **(Exhibit 17).** This personal trip cost taxpayers $944.22 **(Exhibit 18).**

### Ft. Lauderdale, Florida

78.     While in Boston, Singh called Hassan and asked her to look up a "higher cost price [flight] to Orlando, so I can justify me flying to Ft. Lauderdale" to attend a Democratic Party event **(Exhibit 19).**

79.     In response, Hassan sent Singh information regarding a flight from Orlando to Boston that was $894.42 and one from Boston to Ft. Lauderdale for $718.40.   Singh instructed Hassan via text message to "book [the Ft. Lauderdale flight] and use my tsa ####."   Taxpayer funds were used to pay for this trip **(Exhibit 20).**

## OTHER MISUSE OF TAXPAYER FUNDS

80.     In addition to improper travel expenses, Singh improperly used OCPA funds for other purposes related to his personal interests.

81.     For example, Singh joined the Orlando Economic Partnership at its highest membership level, which cost taxpayers $18,750.   Singh wanted to pay the higher fee so he could be on the board of directors.   Ordinarily, regular fees are approximately $3,000.

82.     Singh also instructed McGee to pay $1,000.00 to be a sponsor of the Indian-American Chamber of Commerce (IACC) as opposed to simply becoming a member for $100.00.

83.     Several IACC members were awarded contracts without being vetted through the proper bidding process.

84.     Singh also collects a car allowance of $540 per month ($6,480 per year) intended for his personal vehicle but primarily drives an office vehicle.

85.     Singh rented a Chevy Tahoe from November 4, 2016, through November 15, 2016, to use for campaigning, but submitted a "Request for Payment" to his office.  **(Composite Exhibit 21).**

86.     The Chevy Tahoe was picked up by Hassan and delivered to Singh by McGee on November 4, 2016, at his campaign headquarters off of Sand Lake Road.

87.     Approximately $21,000 of taxpayer funds for campaign items were paid to Bhavesh Patel, who owns a UPS Store, for  brochures (tri-fold) and booklets for purposes unrelated to the OCPA's office.  The invoice for this order is dated May 17, 2016.  **(Exhibit 22).**

88.     Singh also ordered brochures (z-fold), custom outside banners with grommets, and posters not utilized by the OCPA's office.  The invoice for this order is dated October 4, 2016.  **(Exhibit 23).**

89.     On May 16, 2017, when Patel asked Hassan for payment of the invoices and several others (in all, the invoices totaled $22,432) and she approached Singh regarding the request for payment, he told her he would discuss it with her later in the day.  **(Exhibit 24).**

90.     Later in the day when Singh met with Hassan, he handed her the 2016 invoices with a handwritten post-it note on top that read, "Hold Give To Aisha Mid Nov –." **(Exhibit 25)**.  Clearly, Singh wanted to hold back the invoices until after the November 2016 election.

91.     Singh instructed Hassan to make payment on these UPS Store invoices and that he would provide support later, which never occurred.

92.     Singh ordered furniture for his home office using taxpayer funds totaling $2,471.00 **(Composite Exhibit 26)**.

93.     Concerned about the invoices for his personal furniture being questioned because they exceeded a thousand dollars, Singh instructed McGee to have the invoices reissued in amounts under a thousand dollars.

94.     Ultimately, the invoices were reissued in the following amounts of $531.00, $699.00, $499.00, $742.00, which totaled $2,471.00 **(Composite Exhibit 27)**.

95.     The Request(s) for Payment for Singh's personal furniture all list the justification for the purchases the pieces were needed for the "Admin area," which was false **(Composite Exhibit 28)**.

## IMPROPER USE OF OCPA STAFF FOR CAMPAIGN AND OTHER NON-OCPA BUSINESS

96.     Plaintiffs, Usha Tewari, Singh's executive assistant, Aimee Anderson, an OCPA administrative and human relations employee, and others would be forced to work on campaign matters on the clock during office hours.   **(Exhibit 29)**.

97.     Ms. Anderson was required to take Singh's vehicle to get washed and make appointments to get his hair cut on the clock during office hours.

98.     Plaintiffs, Ms. Anderson, Ms. Tewari, and other staff were forced to work after-hour events for Singh.

99.     Plaintiffs, Ms. Anderson, Ms. Tewari, and other staff were forced to participate in parades that purportedly promoted the OCPA office.

100.     The OCPA, at Singh's direction, provided compensatory time for the hours spent at the parades and call the time "a schedule adjustment."

101.     On average, the parades lasted three hours.  OCPA employees were paid by Orange County taxpayers for waving and throwing candy in various parades.

102.     Vikaash Marharaj worked out of Singh's campaign office and did not even come to OCPA offices during the prior weeks leading up to November 2016 election, but was paid by the OCPA.

103.     OCPA employee Mark Viola was sent to Tampa to pick up a campaign check from Dr. Ramcharran on the clock during office hours.

104.     Vikaash Marharaj worked extensive hours on Singh 2016 campaign while on the clock during OCPA regular office hours.

**MANIPULATING APPRAISALS**

105.     Singh has provided homestead exemptions, and refrained from increasing property values (thereby creating tax benefits), for his friends, certain business acquaintances and politicians who supported him during his campaign, including certain timeshare companies.

106.     Conversely, Singh unjustly and unlawfully increased property values for those who objected to his misdeeds, including Hassan and certain theme parks.  **(Exhibit 30).**

**ILLEGAL PROMOTIONAL EXPENSES**

107.     Singh ordered hand towels, t-shirts, baseball hats, and plaques for a trip to India that had no relation to OCPA business.

108. The hand towels, t-shirts, baseball hats, plaques were ordered through Singh's friend, Sanjay Srinivasan, and paid for by using taxpayer dollars and were specifically ordered for Singh's trip to India.

109. The trip was purportedly taken as a result of the OCPA soliciting a meeting with Indian mayor Jagtap of Pune.

110. The actual purpose of the trip was to visit Singh's son, who lives in Pune, India. There was no business purpose for this trip.

111. Singh instructed McGee to draft correspondence to the mayor of Jagtap to make it "appear that it was an official visit" to India. **(Exhibit 31).**

112. Singh had special letterhead ordered to include the FIABCI logo because he was attempting to become a member in the organization. **(Exhibit 32).**

113. One thousand pages of letterhead was ordered from Singh's friend, Bhavesh Patel. Singh requested that Bhavesh Patel change the invoice to reflect a lower invoiced amount.

114. The OCPA, at Singh's direction, ultimately paid $21,000 through a check.

115. McGee's name appeared on the invoice related to this purchase, and others, for goods and services not requested by her.

116. Additionally, Singh ordered 100 white baseball hats with the OCPA logo to distribute for campaign purposes **(Exhibit 33).**

117. Singh had 50 of the hats shipped to Cambridge, Massachusetts **(Exhibit 34)** to distribute to fellow course attendees as a self promotion effort while attending the Harvard course in June 2017, and took the remaining hats to a Democratic Party function in Ft. Lauderdale.

## CREATION OF SHAM NOT-FOR-PROFIT, FLORIDA DIVERSITY, INC.

118.    Florida Diversity, Inc. ("Florida Diversity") was created so that Singh could host events and obtain sponsors, but not have the event/sponsorship revenue be deposited in an OCPA bank account.

119.    Singh required the office staff to create, plan, organize, execute and participate in "STATE OF ORANGE COUNTY REAL ESTATE" events and had sponsors pay the sponsorship fees to Florida Diversity, a non-functioning charity he created.

120.    None of the money went to the OCPA, but instead, Singh's sham charity.

121.    Singh stated that he used the term "diversity" in the name of the organization because he thought it wouldn't be questioned.

122.    A $30,000 surplus was maintained in a Florida Diversity account that Singh stated he would use to pay back any improper expenditures when he "got caught."

123.    Before the 2016 election, the media and a local law firm inquired about Florida Diversity's breakfasts and events.

124.    Concerned, Singh had McGee go to his house and stay until 2 a.m. to review Florida Diversity records and ledgers to see if there were any OCPA "footprints."

125.    During that meeting, Singh had his daughter remove all OCPA employees' names from these records.

126.    Singh directed many employees to work on Florida Diversity business, personal matters and campaign work using taxpayer money.

127.    Florida Diversity hosted a "Mahatma Gandhi" breakfast but, all the work was performed by the OCPA's office staff.

128.    Ms. Tewari and Ms. Anderson and others worked on Florida Diversity matters on the clock during regular office hours.   **(Ex.28).**

## UNUSED CAMPAIGN FUNDS AFTER SINGH'S REELECTION

129.    After the 2016 elections, Singh did not return certain unused campaign donations as required by law.

130.    As result, Singh wrote checks to several employees, including McGee, to make it appear he was paying them for services that were not actually rendered.

131.    McGee refused to cash her check from Singh's campaign account titled "A New Direction for Florida."

132.    Current OCPA COO and 2016 campaign manager, Tatsiana Sokalava's company Alphasphere Strategies was paid $181,000 from these campaign donations.

133.    On June 23, 2017, the day after McGee and Hassan submitted their written complaint, Sokalava dissolved Alphasphere Strategies.

134.    Additionally, a complaint was made by a local attorney relating to this issue and this transaction was also questioned in an Orlando Sentinel article.

## FAILURE TO FOLLOW BID PROCESS FOR VENDORS

135.    Singh also violated laws, rules and regulations relating to the bidding process for OCPA vendors.

### E-Ring

136.    E-Ring was awarded a contract to perform work on the OCPA's CAMA system, a computer application used to track property valuation.

137.    A sum in the amount of $300,000 was paid to E-Ring but it never performed any meaningful work on the CAMA system.

138.     Thereafter, Singh repeatedly badgered E-Ring's representative, Raj Radhakrishnam, for a donation to his 2016 campaign.

139.     E-Ring returned the $300,000 before the election because of Singh's repeated requests for donations and due to the lack of work actually performed by E-Ring **(Exhibit 35).**

### ControlCam

140.     The OCPA awarded a contract to ControlCam for $220,500 for aerial photography work, of which $165,000.00 was initially paid **(Exhibit 36).**

141.     The contract was awarded by the OCPA when a ControlCam representative agreed to have $55,000 from the contract proceeds go to Singh's 2016 campaign.

142.     After that ControlCam representative was fired, another representative, Frank Wilson, emailed the OCPA office demanding payment of the $55,000.

## DENYING PUBLIC RECORDS REQUESTS

143.     Singh directed staff to deliberately delay and deny public records requests from the media, attorneys and other government offices.

144.     Several requests were made about Singh's phone records, emails, theme park appraisal files and other documents from various sources that he did not want to receive the information.

145.     At one point there were several threats to sue him for violating the Sunshine Laws.

146.     Singh ordered Hassan to create unjustifiably high invoices to give to requestors so that they would have to pay thousands of dollars to get their request.

147.     Some invoices were as high as $353,000 and $392,000.

148.     Singh also order Radamus Tirado, the IT manager, to begin changing computers, emails, phones and tablets around so all of his data would be mixed in with other staff members and not traceable to him.

149.     At one point, Singh forced Manish Bhatt, Amy Anderson, Usha Tewari, Laverne McGee, Kathy Marsh and others to stay late after work to help rip pages out of workbooks.

150.     He also had them review all documents to hand over to requestors because they were about to file legal paperwork against him for withholding public information requests.

## SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT

151.     In addition to the unlawful actions described above, the OCPA subjected Plaintiffs to sexual harassment by creating a hostile work environment.

152.     This harassment consisted of frequent and ongoing comments of a sexual nature, perpetuation of sexual innuendo, and demeaning conduct directed toward female employees, vendors and members of the public.

153.     For example, McGee was presented by Singh to his male friends as if she was part of Singh's harem along with other females.

154.     Singh directed McGee to act flirtatious with male vendors.

155.     McGee was also told by Singh to pose as a "hot black chick" on Instagram.

156.     Singh referred to McGee as the "hired help."

157.     Singh instructed McGee to "cover" for him and lie to his wife when he brought women, including strippers, to the OCPA's office after hours.

158.     Singh referred to women as "bitches," "whores," and "skanks."

159.     Singh referred to an African-American reporter as a "black bitch" and "n----r."

160.     Singh would frequently yell at McGee, speak to her in an aggressive, forceful tone, and use profanity directed towards her, which were actions he did not take with male employees.

161.     Singh allowed a false rumor to circulate throughout the office that he and McGee were having an affair.

162.     McGee objected to this conduct.  In response, Singh spoke to McGee in a forceful tone and stated that she was required to comply with his demands.

163.     Hassan likewise was subjected to a hostile work environment.

164.     Hassan received calls and texts from Singh at odd hours on the weekends and evenings pressuring Hassan to meet him.  It was clear that these overtures were unrelated to Hassan's job and constituted thinly veiled propositions to engage in a sexual relationship.

165.     Singh used a lower, false review that was not placed in her HR employee file as a threat to control Hassan.

166.     Hassan was assigned demeaning duties by Singh that were unrelated to her job, such as requiring her to fill up his car with gas, make personal medical appointments, deliver rental cars to him, and making hotel reservations for him for non-work travel.  He also mockingly expressed his approval when Hassan performed tasks, stating "good girl."

167.     Hassan also frequently was present when Singh made derogatory comments regarding women and their anatomy, such as their "fat asses."

168.     Singh did not subject male employees to similarly demeaning or hostile treatment.

169.     Pursuant to the OCPA's policies, McGee and Hassan formally complained about the sexual harassment/hostile work environment in written correspondence to Singh, which was later provided to an investigator hired by the OCPA.

170.    As no internal remedy was provided by the OCPA, Plaintiffs filed charges of discrimination with the EEOC and FCHR on March 1, 2018.

171.    As is set forth below, no remedial action was taken in response to McGee's and Hassan's sexual harassment complaints.  Instead, they were indefinitely placed on administrative leave, advised that the OCPA had concluded that their allegations were false, subjected to retaliatory conduct and, ultimately, constructively discharged.

**WHISTLEBLOWER/PROTECTED SPEECH AND RETALIATION**

172.    On June 22, 2017, Plaintiffs submitted their written complaint to the OCPA regarding violations or suspected violations of state and local law, rule, or regulation committed by the OCPA which created and presented a substantial and specific danger to the public's health, safety, and welfare, and also disclosed acts or suspected acts of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, and gross neglect of duty committed by the OCPA.

173.    This complaint also outlined Plaintiffs' claims of sexual harassment/hostile work environment.

174.    Plaintiffs were put on paid administrative leave on June 26, 2017.

175.    Thereafter, the OCPA initiated a purportedly "independent investigation" into the complaint using outside counsel.

176.    Counsel selected by the OCPA to conduct the investigation was an attorney employed by Morgan & Morgan, which is the same law firm that employs the OCPA's private counsel, Frank Kruppenbacher.

177.    During the course of the investigation, Plaintiffs revealed extensive information about the unlawful conduct of the OCPA.

178.    On February 15, 2018, while Plaintiffs were still waiting on the result of the investigation, the OCPA's attorney was given draft copies of Plaintiffs' charges of discrimination raising gender issues.

179.    On February 20, 2018, Plaintiffs' counsel was notified for the first time that the OCPA was conducting an internal investigation focused on Plaintiffs.  This was pure retaliation.

180.    Plaintiffs had not previously been notified or asked to participate in the internal investigation.

181.    On March 5, Plaintiffs dual filed their respective charges of discrimination.

182.    On May 7, 2018, Plaintiffs were given "pre-disciplinary" memoranda and directed to appear on four days' notice for a "pre-disciplinary meeting" that could, according to the OCPA, result in Plaintiffs' termination.

183.    The OCPA attempted to prevent Plaintiffs from being represented by counsel of their choice at the meeting.

184.    Although Plaintiffs supplied alternate dates for the meeting, it was postponed indefinitely by the OCPA.

185.    Contemporaneously with these actions, the OCPA, on May 11, 2018, removed Plaintiffs from payroll, transforming their paid leave to unpaid and indefinite suspension.

186.    On May 17, 2018, the OCPA's allegedly independent investigator – an attorney who had previously represented the OCPA and works for the same law firm as the OCPA's private counsel – issued a report finding that the OCPA had not engaged in wrongdoing.

187.    The report revealed that the investigator had not considered the documents submitted by Plaintiffs and had not interviewed key current-employee witnesses or any of the former-employee witnesses identified by them.

188.     Although Plaintiffs, through counsel, immediately objected to the incomplete investigation and requested that it be reopened and that due consideration be given to the documents provided, all pertinent current-employee witnesses, the non-employee witnesses, and evidence of potential witness tampering by the OCPA's attorney.

189.     The investigator did not reopen the investigation or to consider this evidence.

190.     In response, the OCPA and its counsel contacted local media sources and made several false claims that placed Plaintiffs in a negative light, which aired on a local news station and in a local newspaper.

191.     In particular, the OCPA and its counsel created the impression that Plaintiffs had been voluntarily collecting pay while idle when, in fact, they were required to be on a paid leave of absence, during which Plaintiffs were barred from being present at the OCPA's offices and the SunTrust building where the OCPA's offices are located.

192.     The mandated leave was imposed upon Plaintiffs after the June 22 initial internal complaint.

193.     The OCPA further asserted that Plaintiffs' complaints were untruthful, and falsely accused them of refusing to swear to their allegations.

194.     The OCPA and its counsel further accused Plaintiffs of wrongdoing and indicated that, notwithstanding the fact that no hearing had taken place, the termination of Plaintiffs was imminent.

195.     Pursuant to the OCPA's policies, Plaintiffs were entitled to utilize their accrued paid time off (PTO) during their unpaid suspensions.

196.    On June 21, 2018, having not received any pay for six weeks, Plaintiffs formally requested that they be paid their PTO for the period starting on May 11,2018 and continuing until their accrued hours were exhausted.

197.    The OCPA did not provide the PTO or otherwise respond to this request until August 31, 2018.

198.    On June 25, 2018, Plaintiffs' counsel was advised that a new law firm was representing the OCPA.

199.    In this correspondence, the OCPA once again demanded that Plaintiffs appear at a pre-disciplinary meeting without their counsel of choice.

200.    In response, Plaintiffs' counsel provided available dates when counsel could be present with Plaintiffs.

201.    On June 28, 2018, Plaintiffs' counsel renewed the request for PTO, this time addressing the correspondence to the OCPA's new counsel.

202.    Once again, the OCPA failed to provide the PTO and did not otherwise respond until late August 2018.

203.    On July 2, 2018, Plaintiffs provided the OCPA's investigator with a sworn verification relating to statements taken in connection with his investigation, thereby dispelling the false assertion that Plaintiffs would not testify under oath.

204.    Despite this, the investigator again declined to reopen the investigation.

205.    Plaintiffs were on an indefinite suspension without pay for four months.

206.    Hassan received notice that the OCPA had increased her property value more than the allowed cap of 3%.

207.    The OCPA's retaliatory actions have clearly been calculated to chill Plaintiffs' efforts to exercise their rights.

208.    These actions have resulted in intolerable harm to their professional reputations and the imposition of severe financial hardship.

209.    Under these circumstances, a reasonable person would feel compelled to resign and collect their accrued PTO in lump sum, as the OCPA's policy permits.

**TERMINATION (HASSAN AND MCGEE)**

210.    The actions of the OCPA, as described above, rendered plaintiffs' working conditions and related circumstances entirely intolerable.  As a result, they were constructively discharged.  On July 16, 2018, the OCPA was notified that Plaintiffs' regarded their employment as having been terminated in this manner.

211.    On August 24, 2018, the OCPA sent correspondence to Plaintiffs stating that they were officially terminated, based upon false and pretexual reasons.

212.    The OCPA subsequently paid Plaintiffs the monies that had been wrongfully withheld during their suspension.

**COUNT I:**
**FLORIDA PUBLIC SECTOR WHISTLEBLOWER ACT**
**(Hassan and McGee)**

213.    Plaintiffs incorporate by reference paragraphs 1 through 212 of this Verified Complaint.

214.    Plaintiffs disclosed information in their written complaint to the OCPA on June 22, 2017, regarding violations or suspected violations of state and local law, rule, or regulation committed by the OCPA which created and presented a substantial and specific danger to the public's health, safety, and welfare.

215.    Additionally, Plaintiffs disclosed information in their written complaint to the OCPA on June 22, 2017, regarding acts or suspected acts of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, and gross neglect of duty committed by the OCPA.

216.    Plaintiffs suffered retaliatory actions because of the information disclosed by them on June 22, 2017.

217.    As a direct and proximate result of their protected activity, Plaintiffs were subjected to retaliatory personnel action by the OCPA, including termination.

218.    As a direct and proximate result of the OCPA's actions, Plaintiffs have suffered a loss of employment and related economic and emotional injuries.

219.    The actions of the OCPA make reinstatement ineffective as a make-whole remedy, entitling Plaintiffs to front pay in lieu of reinstatement.

WHEREFORE, Plaintiffs demand judgment against the OCPA for:

    a.    Compensation for lost wages, benefits, and other remuneration;

    b.    Front pay in lieu of reinstatement;

    c.    Injunctive relief;

    d.    Attorney's fees and costs pursuant to §§ 112.3187-112.31895, Fla. Stat. (2018); and

    e.    Such other relief as this Court deems just and proper.

### COUNT II: SEXUAL HARASSMENT
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### AS AMENDED, 42 U.S.C. § 2000(e)
### (McGee)

220.    Plaintiff McGee incorporates by reference paragraphs 1 through 19, paragraphs 151 through 162, paragraphs 168 through 171, and paragraphs 210 through 212 of this Verified Complaint.

221.    McGee was subjected to unwelcome conduct of a sexual nature that was severe and pervasive and had the effect of adversely impacting her working conditions.

222.    McGee objected to this conduct verbally, in writing, and by filing a charge of discrimination with the EEOC and FCHR.

223.    Despite these complaints, no remedial action was taken against the harasser, Singh.

224.    Instead, the OCPA placed McGee on a leave of absence, barred her from entering the OCPA's offices, conducted a sham investigation, concluded that McGee's allegations were untruthful, falsely accused her of wrongdoing and a nefarious purpose for complaining, published these false findings to the press, and refused to reinstate her.

225.    As a direct, proximate, and foreseeable result of the OCPA's discriminatory actions, McGee has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

226.    McGee has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

WHEREFORE, Plaintiff McGee demands judgment against the OCPA for:

   a.  Compensation for back pay;

   b.  Front pay;

   c.  Compensatory damages;

   d.  Injunctive relief;

   e.  Attorney's fees and costs pursuant to 42 U.S.C. §2000e-5(k); and

   f.  Such other relief as this Court deems just and proper.

**COUNT III:**
**RETALIATION (TITLE VII)**
**(McGee)**

227.   Plaintiff McGee incorporates by reference paragraphs 1 through 19, paragraphs 172 through 205, and paragraphs 207 through 212 of this Verified Complaint.

228.   The OCPA violated Title VII by retaliating against McGee for objecting, through internal complaints and the formal filing of a charge of discrimination, to the unlawful sexual harassment/hostile work environment to which she was subjected.

229.   The OCPA took adverse employment actions against McGee through the acts discussed in paragraphs 172 through 205, and paragraphs 207 through 212.

230.   The adverse employment actions suffered by McGee were causally related to, and in retaliation for, McGee having engaged in the protected activities of complaining about, and objecting in good faith to, unlawful gender discrimination as prohibited by Title VII.

231.   As a direct, proximate, and foreseeable result of the OCPA's retaliatory actions, McGee has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

232.   The actions of the OCPA make reinstatement ineffective as a make whole remedy, entitling McGee to front pay in lieu of reinstatement.

233.   McGee has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff McGee demands judgment against the OCPA for:

a.   Back pay;

28

b. Front pay;

c. Compensatory damages;

d. Attorneys' fees and costs of this action pursuant to 42 U.S.C. §2000e-5(k); and

e. Such other relief as this Court deems just and proper.

## COUNT IV: SEXUAL HARASSMENT
## IN VIOLATION OF THE FCRA
### (McGee)

234.   Plaintiff McGee incorporates by reference paragraphs 1 through 19, paragraphs 151 through 162, paragraphs 168 through 171, and paragraphs 210 through 212 of this Verified Complaint.

235.   McGee was subjected to unwelcome conduct of a sexual nature that was severe and pervasive and had the effect of adversely impacting her working conditions.

236.   McGee objected to this conduct verbally, in writing, and by filing a charge of discrimination with the EEOC and FCHR.

237.   Despite these complaints, no remedial action was taken against the harasser, Singh.

238.   Instead, the OCPA placed McGee on a leave of absence, barred her from entering the OCPA's offices, conducted a sham investigation, concluded that McGee's allegations were untruthful, falsely accused her of wrongdoing and a nefarious purpose for complaining, published these false findings to the press, and refused to reinstate her.

239.   As a direct, proximate, and foreseeable result of the OCPA's discriminatory actions, McGee has suffered past and future pecuniary losses, emotional pain, suffering,

embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of

dignity, emotional distress and other non-pecuniary losses and intangible injuries.

240.    McGee has retained counsel to represent her in this matter and has incurred, and

will continue to incur, attorney's fees and costs.

WHEREFORE, Plaintiff McGee demands judgment against the OCPA for:

      a.   Compensation for back pay;

      b.   Front pay;

      c.   Compensatory damages;

      d.   Injunctive relief;

      e.   Attorney's fees and costs pursuant to § 760.11(5), Fla. Stat.; and

      f.   Such other relief as this Court deems just and proper.

## COUNT V:
## RETALIATION (FCRA)
### (McGee)

241.    Plaintiff McGee incorporates by reference paragraphs 1 through 19, and

paragraphs 172 through 205, and paragraphs 207 through 212 of this Verified Complaint.

242.    The OCPA violated the FCRA by retaliating against McGee for objecting to the

unlawful gender discrimination and a racially hostile work environment to which others were

being subjected, with such practices constituting unlawful employment practices.

243.    The OCPA took adverse employment actions against McGee through the acts

discussed in paragraphs 172 through 205, and paragraphs 207 through 212.

244.    The adverse employment actions suffered by McGee were causally related to, and

in retaliation for, McGee having engaged in the protected activities of complaining about, and

objecting in good faith to, unlawful gender discrimination as prohibited by the FCRA.

245.     As a direct, proximate, and foreseeable result of the OCPA's retaliatory actions, McGee has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

246.     The actions of the OCPA make reinstatement ineffective as a make whole remedy, entitling McGee to front pay in lieu of reinstatement.

247.     McGee has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff McGee demands judgment against the OCPA for:

    a.   Back pay;

    b.   Front pay;

    c.   Compensatory damages;

    d.   Attorneys' fees and costs of this action pursuant to § 760.11(5), Fla. Stat.; and

    e.   Such other relief as this Court deems just and proper.

## COUNT VI: SEXUAL HARASSMENT
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
## AS AMENDED, 42 U.S.C. § 2000(e)
### (Hassan)

248.     Plaintiff Hassan incorporates by reference paragraphs 1 through 19, paragraphs 151-152, paragraphs 163-171, and paragraphs 210 through 212 of this Verified Complaint.

249.     Hassan was subjected to unwelcome conduct of a sexual nature that was severe and pervasive and had the effect of adversely impacting her working conditions.

250.     Hassan objected to this conduct verbally, in writing, and by filing a charge of discrimination with the EEOC and FCHR.

251.    Despite these complaints, no remedial action was taken against the harasser, Singh.

252.    Instead, the OCPA placed Hassan on a leave of absence, barred her from entering the OCPA's offices, conducted a sham investigation, concluded that Hassan's allegations were untruthful, falsely accused her of wrongdoing and a nefarious purpose for complaining, published these false findings to the press, and refused to reinstate her.

253.    As a direct, proximate, and foreseeable result of the OCPA's discriminatory actions, Hassan has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

254.    Hassan has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

WHEREFORE, Plaintiff Hassan demands judgment against the OCPA for:

    a.   Compensation for back pay;

    b.   Front pay;

    c.   Compensatory damages;

    d.   Injunctive relief;

    e.   Attorney's fees and costs pursuant to 42 U.S.C. §2000e-5(k); and

    f.   Such other relief as this Court deems just and proper.

<u>**COUNT VII:**</u>
<u>**RETALIATION (TITLE VII)**</u>
**(Hassan)**

255.    Plaintiff Hassan incorporates by reference paragraphs 1 through 19, paragraphs 172 through 212 of this Verified Complaint.

256.    The OCPA violated Title VII by retaliating against Hassan for objecting to the unlawful gender discrimination to which others were being subjected, with such practices constituting unlawful employment practices.

257.    The OCPA took adverse employment actions against Hassan through the acts discussed in paragraphs 172 through 212.

258.    The adverse employment actions suffered by Hassan were causally related to, and in retaliation for, Hassan having engaged in the protected activities of complaining about, and objecting in good faith to, unlawful gender discrimination as prohibited by Title VII.

259.    As a direct, proximate, and foreseeable result of the OCPA's retaliatory actions, Hassan has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

260.    The actions of the OCPA make reinstatement ineffective as a make whole remedy, entitling Hassan to front pay in lieu of reinstatement.

261.    Hassan has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Hassan demands judgment against the OCPA for:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Attorneys' fees and costs of this action pursuant to 42 U.S.C. §2000e-5(k); and

e.   Such other relief as this Court deems just and proper.

## COUNT VIII: SEXUAL HARASSMENT
## IN VIOLATION OF THE FCRA
### (Hassan)

262.   Plaintiff Hassan incorporates by reference paragraphs 1 through 19, paragraphs 151-152, paragraphs 163-171, and paragraphs 210 through 212 of this Verified Complaint.

263.   Hassan was subjected to unwelcome conduct of a sexual nature that was severe and pervasive and had the effect of adversely impacting her working conditions.

264.   Hassan objected to this conduct verbally, in writing, and by filing a charge of discrimination with the EEOC and FCHR.

265.   Despite these complaints, no remedial action was taken against the harasser, Singh.

266.   Instead, the OCPA placed Hassan on a leave of absence, barred her from entering the OCPA's offices, conducted a sham investigation, concluded that Hassan's allegations were untruthful, falsely accused her of wrongdoing and a nefarious purpose for complaining, published these false findings to the press, and refused to reinstate her.

267.   As a direct, proximate, and foreseeable result of the OCPA's discriminatory actions, Hassan has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

268.   Hassan has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

WHEREFORE, Plaintiff Hassan demands judgment against the OCPA for:

a.   Compensation for back pay;

  b. Front pay;

  c. Compensatory damages;

  d. Injunctive relief;

  e. Attorney's fees and costs pursuant to § 760.11(5), Fla. Stat.; and

  f. Such other relief as this Court deems just and proper.

**COUNT IX:**
**RETALIATION (FCRA)**
**(Hassan)**

269. Plaintiff Hassan incorporates by reference paragraphs 1 through 19, paragraphs 172 through 212 of this Verified Complaint.

270. The OCPA violated the FCRA by retaliating against Hassan for objecting to the unlawful gender discrimination to which others were being subjected, with such practices constituting unlawful employment practices.

271. The OCPA took adverse employment actions against Hassan through the acts discussed in paragraphs 172 through 212.

272. The adverse employment actions suffered by Hassan were causally related to, and in retaliation for, Hassan having engaged in the protected activities of complaining about, and objecting in good faith to, unlawful gender discrimination as prohibited by the FCRA.

273. As a direct, proximate, and foreseeable result of the OCPA's retaliatory actions, Hassan has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

274. The actions of the OCPA make reinstatement ineffective as a make whole remedy, entitling Hassan to front pay in lieu of reinstatement.

35

275.     Hassan has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Hassan demands judgment against the OCPA for:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Attorneys' fees and costs of this action pursuant to pursuant to § 760.11(5), Fla. Stat.; and

e.  Such other relief as this Court deems just and proper.

## COUNT X: RETALIATION
## (FIRST AMENDMENT OF U.S. CONSTITUTION PURSUANT TO 42 U.S.C. § 1983)
## (Hassan and McGee)

276.     Plaintiffs incorporate by reference paragraphs 1 through 9, paragraphs 16 through 19, and paragraphs 172 through 212 of this Verified Complaint.

277.     The Conduct of the OCPA complained of herein was taken under color of the laws of the State of Florida.

278.     The OCPA is of such position and authority that his acts may fairly be said to constitute the official expressions of the OCPA's custom, policy or usage.

279.     Plaintiffs engaged in constitutionally protected conduct by making statements relating to matters of public interest, including the gross misuse of taxpayer funds, altering property values, violations of Florida's sunshine laws, and discriminatory conduct by the OCPA.

280.    Plaintiffs' statements involved matters of public concern that outweighed the interests of the OCPA as an employer, as the public has a substantial interest in actions that affect taxpayer dollars and property values.

281.    Plaintiffs' protected statements involved matters that either were not within their job duties for the OCPA, or involved circumstances in which Singh usurped their duties.

282.    Plaintiffs' statements were the type traditionally covered under the First Amendment of the United States Constitution.

283.    The adverse employment actions suffered by Plaintiffs were casually related to, and in retaliation for, Plaintiffs having engaged in constitutionally protected conduct by making statements relating to matters of public interest.

284.    The OCPA's retaliatory conduct depraved Plaintiffs of their constitutionally-protected rights of free speech under the First Amendment of the United States Constitution.

285.    No legitimate governmental interest was served in denying Plaintiffs their free speech rights.

286.    As a direct, proximate, and foreseeable result of the OCPA's retaliatory actions, Plaintiffs suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

287.    The actions of the OCPA make reinstatement ineffective as a make whole remedy, entitling Plaintiffs to front pay in lieu of reinstatement.

288.    Plaintiffs retained counsel to represent them in this matter and have incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the OCPA for:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1983; and

e.  Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues and counts triable of right before a

jury.

Date:   November 6, 2018.

Respectfully submitted,

s/ Jill S. Schwartz
Jill S. Schwartz, Esquire
Florida Bar No.  523021
David H. Spalter, Esquire
Florida Bar No. 0966347
Christopher A. Pace, Esquire
Florida Bar No. 676721
JILL S. SCHWARTZ & ASSOCIATES, P.A.
655 W. Morse Blvd., Suite 212
Winter Park, Florida 32789
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
E-mail: jschwartz@schwartzlawfirm.net
E-mail: dspalter@schwartzlawfirm.net
E-mail: cpace@schwartzlawfirm.net

Attorneys for Plaintiffs

## <u>VERIFICATION</u>

Personally appeared before the undersigned, AISHA HASSAN, who being first duly sworn, deposes and says that the allegations of this Verified Complaint and Demand for Jury Trial, are true and correct to the best of her knowledge, information and belief.

_____

AISHA HASSAN

STATE OF FLORIDA        )
COUNTY OF <u>ORANGE</u>  )

The foregoing instrument was acknowledged before me this <u>6th</u> day of November, 2018, by AISHA HASSAN, who is personally known to me or who has produced _____ as identification, and who did take an oath.

_____
Notary Public – State of Florida at Large
My Commission Expires: <u>12/14/18</u>



JANE M. TACKTILL
MY COMMISSION # FF 178686
EXPIRES: December 14, 2018
Bonded Thru Notary Public Underwriters

## VERIFICATION

Personally appeared before the undersigned, LAVERNE MCGEE, who being first duly sworn, deposes and says that the allegations of this Verified Complaint and Demand for Jury Trial, are true and correct to the best of her knowledge, information and belief.

_____

LAVERNE MCGEE

STATE OF FLORIDA        )
COUNTY OF __ORANGE__    )

The foregoing instrument was acknowledged before me this __6th__ day of November, 2018, by LAVERNE MCGEE, who is (personally known to me) or who has produced _____ as identification, and who did take an oath.


_____
Notary Public – State of Florida at Large
My Commission Expires: __12/14/18__


JANE M. TACKTILL
MY COMMISSION # FF 176686
EXPIRES: December 14, 2018
Bonded Thru Notary Public Underwriters